## GENERAL RELEASE AND SETTLEMENT AGREEMENT

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Bridget Beckford ("Beckford") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

I

For and in consideration of the execution and non-revocation of this Agreement by Beckford, Access agrees to provide Beckford with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows:  (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the total amount of mediation fees and expenses incurred by Beckford and the

other Plaintiffs in the Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Beckford in the gross amount of five thousand two hundred and forty-five dollars and fifty-nine cents ($5,245.59), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Beckford a Form W-2 at year-end for such payment; (c) a check made payable to Beckford in the gross amount of five thousand two hundred and forty-five dollars and fifty-nine cents ($5,245.59), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) <u>less</u> the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]  These benefits are provided in settlement of all Beckford's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Beckford against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al. v. Access Insurance Holdings, Inc.* (the "Lawsuit").

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

Delivery of the settlement checks shall be made to Beckford's attorney of record, Abigail J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above, following: (1) dismissal of Beckford's claims in the Lawsuit, with prejudice; (2) receipt by defense counsel, Martenson, Hasbrouck & Simon LLP, of the original, facsimile, or e-mail copy of this Agreement; (3) Court approval of this Agreement; and (4) receipt of a W-9 form executed by Barrett & Farahany, LLP. The documents referenced in numbers (2) and (4) of the preceding sentence shall be sent to: Lisa J. Bauer, Martenson, Hasbrouck & Simon LLP, 3379 Peachtree Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the receipt and sufficiency of which are hereby acknowledged, Beckford does hereby knowingly and voluntarily release and forever discharge, both jointly and severally, Access, its corporate parent(s) and affiliates, their officers, directors, employees (current and former), and their shareholders, attorneys, servants and agents, together with their successors in interest by conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity (hereinafter collectively referred to as "claims"), whether known or unknown, which she ever had, now has, or may or might in the future have against the Releasees, arising out of events or occurrences which arose at or before the moment Beckford signs this Agreement, including, but not limited to (i) those claims arising out of or in any way connected with the circumstances surrounding the Lawsuit; (ii) those claims arising out of the employment relationship which existed between Beckford and Access and/or the termination of that

relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29

U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f),

*et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment

for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the

Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under

the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other

applicable state fair employment practices statute, and/or any ordinance promulgated by any

county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay

Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for

Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or

ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29

U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time,

and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29

U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management

relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other

applicable state and local wage and hour statutes; (x) those claims arising under the Worker

Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and

Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising

under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.,* the Whistleblower

Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.* and/or any other state or federal

retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those

claims arising under any federal or state handicap or disability discrimination act, regulation

or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious conduct of any kind; (xvii) those claims for interference with business relationships, contractual relationships, or employment relationships of any kind; (xviii) those claims for breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims for interference with and/or breach of contract (express or implied, in fact or in law, oral or written); (xx) those claims arising under or in reliance upon any statute, regulation or ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-20(b); (xxiii) those claims arising under O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-280; (xxvi) any and all other claims which Beckford ever had, now has, or may or might in the future have arising by reason of or in any way connected with any employment relationship which may have existed prior to or on the date hereof between Beckford and Access and/or the termination of that relationship.

III

Beckford further acknowledges and covenants that, in consideration for the agreements and commitments set forth herein, she has knowingly relinquished, waived and forever released any and all damages and remedies which might otherwise be available to her, including, without limitation, claims for contract or tort damages of any type, claims for legal

or equitable relief under either federal or state statutory and common law, claims for backpay, reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any lawsuit or administrative action arising out of her employment with Access.  Beckford further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Beckford, Beckford shall not accept any benefits awarded in her favor, if any, including without limitation, any damages or injunctive relief specific to Beckford. Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived.  In this regard, Beckford acknowledges and agrees that she has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to her for her entire tenure of employment with Access and that the consideration being provided her herein is above and beyond that which is available under any severance or other policy of Access.

IV

Beckford further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by her herein.  Beckford also acknowledges and covenants that she understands that after signing this Agreement, she cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it.  Beckford further agrees that she will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice, including but not limited to executing a Stipulation of Dismissal and returning it to Access's counsel for filing with the Court.

V

Beckford agrees that she shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that she shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to her described in Paragraph I above.  The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Beckford represents, understands, and agrees that she will not apply for or otherwise seek employment with Access and that she will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates.  Beckford further acknowledges and agrees that, if she is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Beckford's employment, upon becoming aware of Beckford's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Beckford agrees and covenants that she will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or friends.  Access likewise agrees that, if Beckford's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond

merely by verifying Beckford's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Beckford during any such communications. Beckford does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Beckford agrees and covenants that she has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to her satisfaction. Beckford further represents and agrees that she was advised and encouraged, prior to her execution of this Agreement, to discuss and review all aspects of this Agreement with her private attorney and that she has, to the extent she wished to do so, availed herself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Beckford voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Beckford may have. Beckford also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

XI

This Agreement shall be binding upon Beckford, her heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Beckford based or founded upon any of the claims released herein. All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns. Beckford represents and warrants that, as of the date of execution of this Agreement, she has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein. Beckford further agrees that she shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be asserted against the amount paid in settlement of this action or against any recovery by Beckford in this Lawsuit.

XII

Beckford acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

XIII

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

XIV

This Agreement constitutes the entire agreement between Beckford and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or

contemporaneous agreements, representations or understandings, written or oral.  It is expressly understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Beckford and an authorized representative of Access.  This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Beckford with Access and/or Beckford's separation from that employment.

XV

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN  WITNESS  WHEREOF, Bridget  Beckford  sets  her  hand  and  seal  this 29 day  of _October_, 2013.

_Bridget Beckford_
Bridget Beckford

Sworn to and subscribed to before
me this 29 day of _October_ 2013.

_[signature]_
Notary Public     Registration 144399
                  my commission expires: 1/31/2017

For and on behalf of Access Insurance Holdings, Inc.

Page 10 of 10

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Benjamin Napper ("Napper") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

I

For and in consideration of the execution and non-revocation of this Agreement by Napper, Access agrees to provide Napper with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows: (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the total amount of mediation fees and expenses incurred by Napper and the other Plaintiffs in the

Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Napper in the gross amount of six thousand three hundred and sixteen dollars and thirty-seven cents ($6,316.37), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Napper a Form W-2 at year-end for such payment; (c) a check made payable to Napper in the gross amount of six thousand three hundred and sixteen dollars and thirty-seven cents ($6,316.37), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) less the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]  These benefits are provided in settlement of all Napper's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Napper against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al. v. Access Insurance Holdings, Inc.* (the "Lawsuit"); and the Charge of Discrimination filed by Napper

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

currently pending before the U.S. Equal Employment Opportunity Commission, which has been assigned EEOC Charge Number 410-2011-03855 (the "Napper Charge").

Delivery of the settlement checks shall be made to Napper's attorney of record, Abigail J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above, following: (1) dismissal of Napper's claims in the Lawsuit, with prejudice; (2) withdrawal of the Napper Charge; (3) receipt by defense counsel, Martenson, Hasbrouck & Simon LLP, of the original, facsimile, or e-mail copy of this Agreement; (4) Court approval of this Agreement; and (5) receipt of a W-9 form executed by Barrett & Farahany, LLP. The documents referenced in numbers (3) and (5) of the preceding sentence shall be sent to: Lisa J. Bauer, Martenson, Hasbrouck & Simon LLP, 3379 Peachtree Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the receipt and sufficiency of which are hereby acknowledged, Napper does hereby knowingly and voluntarily release and forever discharge, both jointly and severally, Access, its corporate parent(s) and affiliates, their officers, directors, employees (current and former), and their shareholders, attorneys, servants and agents, together with their successors in interest by conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity (hereinafter collectively referred to as "claims"), whether known or unknown, which he ever had, now has, or may or might in the future have against the Releasees, arising out of events or occurrences which arose at or before the moment Napper signs this Agreement, including, but not limited to (i) those claims arising out of or in any way connected with the

circumstances surrounding the Lawsuit and/or the Napper Charge; (ii) those claims arising out of the employment relationship which existed between Napper and Access and/or the termination of that relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f), *et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other applicable state fair employment practices statute, and/or any ordinance promulgated by any county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time, and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other applicable state and local wage and hour statutes; (x) those claims arising under the Worker Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.*, the Whistleblower Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.*

and/or any other state or federal retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those claims arising under any federal or state handicap or disability discrimination act, regulation or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious conduct of any kind; (xvii) those claims for interference with business relationships, contractual relationships, or employment relationships of any kind; (xviii) those claims for breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims for interference with and/or breach of contract (express or implied, in fact or in law, oral or written); (xx) those claims arising under or in reliance upon any statute, regulation or ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-20(b); (xxiii) those claims arising under O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-280; (xxvi) any and all other claims which Napper ever had, now has, or may or might in the future have arising by reason of or in any way connected with any employment relationship which may have existed prior to or on the date hereof between Napper and Access and/or the termination of that relationship.

III

Napper further acknowledges and covenants that, in consideration for the agreements and commitments set forth herein, he has knowingly relinquished, waived and forever

released any and all damages and remedies which might otherwise be available to him, including, without limitation, claims for contract or tort damages of any type, claims for legal or equitable relief under either federal or state statutory and common law, claims for backpay, reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any lawsuit or administrative action arising out of his employment with Access. Napper further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Napper, Napper shall not accept any benefits awarded in his favor, if any, including without limitation, any damages or injunctive relief specific to Napper. Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived. In this regard, Napper acknowledges and agrees that he has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to him for his entire tenure of employment with Access and that the consideration being provided him herein is above and beyond that which is available under any severance or other policy of Access.

IV

Napper further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by him herein. Napper also acknowledges and covenants that he understands that after signing this Agreement, he cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it. Napper further agrees that he will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice,

Page 6 of 11

including but not limited to executing a Stipulation of Dismissal and returning it to Access's counsel for filing with the Court, and to withdraw the Napper Charge.

V

Napper agrees that he shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that he shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to him described in Paragraph I above. The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Napper represents, understands, and agrees that he will not apply for or otherwise seek employment with Access and that he will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates. Napper further acknowledges and agrees that, if he is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Napper's employment, upon becoming aware of Napper's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Napper agrees and covenants that he will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or

friends.  Access likewise agrees that, if Napper's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond merely by verifying Napper's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Napper during any such communications.  Napper does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Napper agrees and covenants that he has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to his satisfaction.  Napper further represents and agrees that he was advised and encouraged, prior to his execution of this Agreement, to discuss and review all aspects of this Agreement with his private attorney and that he has, to the extent he wished to do so, availed himself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Napper voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Napper may have.  Napper also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

## XI

Napper acknowledges that he was given at least twenty-one (21) days to consider this Agreement prior to signing, and that he has seven (7) days after execution to revoke his agreement to its terms. In the event Napper decides to waive the twenty-one (21) day time period in which to consider this Agreement and decide to sign this Agreement immediately, he agrees to execute the Waiver attached hereto as Exhibit A.

## XII

This Agreement shall be binding upon Napper, his heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Napper based or founded upon any of the claims released herein. All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns. Napper represents and warrants that, as of the date of execution of this Agreement, he has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein. Napper further agrees that he shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be asserted against the amount paid in settlement of this action or against any recovery by Napper in this Lawsuit.

## XIII

Napper acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

## XIV

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

## XV

This Agreement constitutes the entire agreement between Napper and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or contemporaneous agreements, representations or understandings, written or oral.  It is expressly understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Napper and an authorized representative of Access.  This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Napper with Access and/or Napper's separation from that employment.

## XVI

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN WITNESS WHEREOF, Benjamin Napper sets his hand and seal this 13th day of

_____ , 2013.

_____

Benjamin Napper

Sworn to and subscribed to before
me this 13th day of November 2013.

_____

Notary Public

CARMEN I. GARDNER
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 2/8/2017

_____

For and on behalf of Access Insurance Holdings, Inc.

## Exhibit A

## WAIVER OF TWENTY-ONE (21) DAY CONSIDERATION PERIOD

I, Benjamin Napper , understand and agree to the following:

1. In connection with a Lawsuit I have filed in the U.S. District Court for the Northern District of Georgia against Access Insurance Holdings, Inc., I have been presented with a Settlement Agreement and General Release ("Agreement") that I have to sign in order to receive any settlement proceeds.

2. The Agreement provides that I have been given the opportunity to take twenty-one (21) days to consider the Agreement before signing it.

3. I have reviewed the Agreement, and I understand it and am in agreement with its terms.

4. I would prefer to sign and return this Agreement and receive my settlement proceeds without having to wait the entire twenty-one (21) day consideration period.

5. In order to sign and return this Agreement and receive my settlement payment(s) without having to wait the entire twenty-one (21) day consideration period, I hereby waive my right to take twenty-one (21) days to consider the Agreement before signing it, and instead choose to sign it at the same time as this Waiver or soon thereafter.

BY SIGNING MY NAME BELOW, I HEREBY CERTIFY THAT I UNDERSTAND AND AGREE TO THE TERMS OF THIS WAIVER, AND THAT MY DECISION TO SIGN THIS WAIVER WAS ENTIRELY VOLUNTARY.

Dated: 11/13/13 , 2013

Benjamin Napper

## <u>GENERAL RELEASE AND SETTLEMENT AGREEMENT</u>

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Bonji Hopson ("Hopson") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

I

For and in consideration of the execution and non-revocation of this Agreement by Hopson, Access agrees to provide Hopson with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows:  (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the total amount of mediation fees and expenses incurred by Hopson and the other Plaintiffs in

the Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Hopson in the gross amount of four thousand two hundred dollars and zero cents ($4,200.00), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Hopson a Form W-2 at year-end for such payment; (c) a check made payable to Hopson in the gross amount of four thousand two hundred dollars and zero cents ($4,200.00), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) less the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]   These benefits are provided in settlement of all Hopson's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Hopson against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al. v. Access Insurance Holdings, Inc.* (the "Lawsuit").

Delivery of the settlement checks shall be made to Hopson's attorney of record, Abigail J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above,

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

following: (1) dismissal of Hopson's claims in the Lawsuit, with prejudice; (2) receipt by

defense counsel, Martenson, Hasbrouck & Simon LLP, of the original, facsimile, or e-mail copy

of this Agreement; (3) Court approval of this Agreement; and (4) receipt of a W-9 form executed

by Barrett & Farahany, LLP. The documents referenced in numbers (2) and (4) of the preceding

sentence shall be sent to: Lisa J. Bauer, Martenson, Hasbrouck & Simon LLP, 3379 Peachtree

Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the

receipt and sufficiency of which are hereby acknowledged, Hopson does hereby knowingly

and voluntarily release and forever discharge, both jointly and severally, Access, its corporate

parent(s) and affiliates, their officers, directors, employees (current and former), and their

shareholders, attorneys, servants and agents, together with their successors in interest by

conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to

as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of

money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity

(hereinafter collectively referred to as "claims"), whether known or unknown, which she ever

had, now has, or may or might in the future have against the Releasees, arising out of events

or occurrences which arose at or before the moment Hopson signs this Agreement, including,

but not limited to (i) those claims arising out of or in any way connected with the

circumstances surrounding the Lawsuit; (ii) those claims arising out of the employment

relationship which existed between Hopson and Access and/or the termination of that

relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29

U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f),

Page 3 of 10

*et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other applicable state fair employment practices statute, and/or any ordinance promulgated by any county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time, and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other applicable state and local wage and hour statutes; (x) those claims arising under the Worker Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.*, the Whistleblower Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.* and/or any other state or federal retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those claims arising under any federal or state handicap or disability discrimination act, regulation or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for

intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those

claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to

negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious

conduct of any kind; (xvii) those claims for interference with business relationships,

contractual relationships, or employment relationships of any kind; (xviii) those claims for

breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims

for interference with and/or breach of contract (express or implied, in fact or in law, oral or

written); (xx) those claims arising under or in reliance upon any statute, regulation or

ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those

claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-

20(b); (xxiii) those claims arising under  O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims

arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-

280; (xxvi) any and all other claims which Hopson ever had, now has, or may or might in the

future have arising by reason of or in any way connected with any employment relationship

which may have existed prior to or on the date hereof between Hopson and Access and/or the

termination of that relationship.

III

Hopson further acknowledges and covenants that, in consideration for the agreements

and commitments set forth herein, she has knowingly relinquished, waived and forever

released any and all damages and remedies which might otherwise be available to her,

including, without limitation, claims for contract or tort damages of any type, claims for legal

or equitable relief under either federal or state statutory and common law, claims for backpay,

reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any

Page 5 of 10

lawsuit or administrative action arising out of her employment with Access.  Hopson further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Hopson, Hopson shall not accept any benefits awarded in her favor, if any, including without limitation, any damages or injunctive relief specific to Hopson.  Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived.  In this regard, Hopson acknowledges and agrees that she has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to her for her entire tenure of employment with Access and that the consideration being provided her herein is above and beyond that which is available under any severance or other policy of Access.

IV

Hopson further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by her herein.  Hopson also acknowledges and covenants that she understands that after signing this Agreement, she cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it.  Hopson further agrees that she will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice, including but not limited to executing a Stipulation of Dismissal and returning it to Access's counsel for filing with the Court.

V

Hopson agrees that she shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that she shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to her described in Paragraph I above. The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Hopson represents, understands, and agrees that she will not apply for or otherwise seek employment with Access and that she will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates. Hopson further acknowledges and agrees that, if she is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Hopson's employment, upon becoming aware of Hopson's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Hopson agrees and covenants that she will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or friends. Access likewise agrees that, if Hopson's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond

merely by verifying Hopson's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Hopson during any such communications.  Hopson does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Hopson agrees and covenants that she has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to her satisfaction.  Hopson further represents and agrees that she was advised and encouraged, prior to her execution of this Agreement, to discuss and review all aspects of this Agreement with her private attorney and that she has, to the extent she wished to do so, availed herself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Hopson voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Hopson may have.  Hopson also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

XI

This Agreement shall be binding upon Hopson, her heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Hopson based or founded upon any of the claims released herein. All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns. Hopson represents and warrants that, as of the date of execution of this Agreement, she has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein. Hopson further agrees that she shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be asserted against the amount paid in settlement of this action or against any recovery by Hopson in this Lawsuit.

XII

Hopson acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

XIII

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

XIV

This Agreement constitutes the entire agreement between Hopson and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or

contemporaneous agreements, representations or understandings, written or oral.  It is expressly understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Hopson and an authorized representative of Access.  This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Hopson with Access and/or Hopson's separation from that employment.

XV

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN  WITNESS  WHEREOF,  Bonji  Hopson  sets  her  hand  and  seal  this _23_ day  of _October_ , 2013.

_____

Bonji Hopson

Sworn to and subscribed to before
me this _23_ day of _October_ 2013.

LINDA PETMECKY
NOTARY PUBLIC
Dekalb County
State of Georgia
My Comm. Expires December 5, 2016

_____
Notary Public

_____

For and on behalf of Access Insurance Holdings, Inc.

Page 10 of 10

LINDA PETMECKY,
NOTARY PUBLIC
Dekalb County
State of Georgia
My Comm. Expires December 5, 2016

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Bridgette Fashion ("Fashion") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

### I

For and in consideration of the execution and non-revocation of this Agreement by Fashion, Access agrees to provide Fashion with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows:  (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the

total amount of mediation fees and expenses incurred by Fashion and the other Plaintiffs in the Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Fashion in the gross amount of six thousand three hundred and eighty-five dollars and forty-five cents ($6,385.45), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Fashion a Form W-2 at year-end for such payment; (c) a check made payable to Fashion in the gross amount of six thousand three hundred and eighty-five dollars and forty-five cents ($6,385.45), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) <u>less</u> the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]   These benefits are provided in settlement of all Fashion's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Fashion against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al.  v. Access Insurance Holdings, Inc.* (the "Lawsuit").

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

Delivery of the settlement checks shall be made to Fashion's attorney of record, Abigail J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above, following:  (1) dismissal of Fashion's claims in the Lawsuit, with prejudice; (2) receipt by defense counsel, Martenson, Hasbrouck & Simon LLP, of the original, facsimile, or e-mail copy of this Agreement; (3) Court approval of this Agreement; and (4) receipt of a W-9 form executed by Barrett & Farahany, LLP.  The documents referenced in numbers (2) and (4) of the preceding sentence shall be sent to: Lisa J. Bauer, Martenson, Hasbrouck & Simon LLP, 3379 Peachtree Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the receipt and sufficiency of which are hereby acknowledged, Fashion does hereby knowingly and voluntarily release and forever discharge, both jointly and severally, Access, its corporate parent(s) and affiliates, their officers, directors, employees (current and former), and their shareholders, attorneys, servants and agents, together with their successors in interest by conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity (hereinafter collectively referred to as "claims"), whether known or unknown, which she ever had, now has, or may or might in the future have against the Releasees, arising out of events or occurrences which arose at or before the moment Fashion signs this Agreement, including, but not limited to (i) those claims arising out of or in any way connected with the circumstances surrounding the Lawsuit; (ii) those claims arising out of the employment

relationship which existed between Fashion and Access and/or the termination of that relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f), *et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other applicable state fair employment practices statute, and/or any ordinance promulgated by any county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time, and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other applicable state and local wage and hour statutes; (x) those claims arising under the Worker Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.,* the Whistleblower Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.* and/or any other state or federal

retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those claims arising under any federal or state handicap or disability discrimination act, regulation or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious conduct of any kind; (xvii) those claims for interference with business relationships, contractual relationships, or employment relationships of any kind; (xviii) those claims for breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims for interference with and/or breach of contract (express or implied, in fact or in law, oral or written); (xx) those claims arising under or in reliance upon any statute, regulation or ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-20(b); (xxiii) those claims arising under  O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-280; (xxvi) any and all other claims which Fashion ever had, now has, or may or might in the future have arising by reason of or in any way connected with any employment relationship which may have existed prior to or on the date hereof between Fashion and Access and/or the termination of that relationship.

III

Fashion further acknowledges and covenants that, in consideration for the agreements and commitments set forth herein, she has knowingly relinquished, waived and forever released any and all damages and remedies which might otherwise be available to her, including, without limitation, claims for contract or tort damages of any type, claims for legal or equitable relief under either federal or state statutory and common law, claims for backpay, reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any lawsuit or administrative action arising out of her employment with Access.  Fashion further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Fashion, Fashion shall not accept any benefits awarded in her favor, if any, including without limitation, any damages or injunctive relief specific to Fashion. Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived.  In this regard, Fashion acknowledges and agrees that she has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to her for her entire tenure of employment with Access and that the consideration being provided her herein is above and beyond that which is available under any severance or other policy of Access.

IV

Fashion further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by her herein.  Fashion also acknowledges and covenants that she understands

Page 6 of 11

that after signing this Agreement, she cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it.  Fashion further agrees that she will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice, including but not limited to executing a Stipulation of Dismissal and returning it to Access's counsel for filing with the Court.

V

Fashion agrees that she shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that she shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to her described in Paragraph I above.  The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Fashion represents, understands, and agrees that she will not apply for or otherwise seek employment with Access and that she will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates.  Fashion further acknowledges and agrees that, if she is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Fashion's employment, upon becoming aware of Fashion's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Fashion agrees and covenants that she will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or friends.   Access likewise agrees that, if Fashion's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond merely by verifying Fashion's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Fashion during any such communications.   Fashion does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Fashion agrees and covenants that she has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to her satisfaction.   Fashion further represents and agrees that she was advised and encouraged, prior to her execution of this Agreement, to discuss and review all aspects of this Agreement with her private attorney and that she has, to the extent she wished to do so, availed herself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Fashion voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Fashion may have.   Fashion also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

XI

Fashion acknowledges that she was given at least twenty-one (21) days to consider this Agreement prior to signing, and that she has seven (7) days after execution to revoke her agreement to its terms.  In the event Fashion decides to waive the twenty-one (21) day time period in which to consider this Agreement and decide to sign this Agreement immediately, she agrees to execute the Waiver attached hereto as Exhibit A.

XII

This Agreement shall be binding upon Fashion, her heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Fashion based or founded upon any of the claims released herein. All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns.  Fashion represents and warrants that, as of the date of execution of this Agreement, she has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein.  Fashion further agrees that she shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be

asserted against the amount paid in settlement of this action or against any recovery by Fashion in this Lawsuit.

## XIII

Fashion acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

## XIV

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

## XV

This Agreement constitutes the entire agreement between Fashion and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or contemporaneous agreements, representations or understandings, written or oral.  It is expressly understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Fashion and an authorized representative of Access.  This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Fashion with Access and/or Fashion's separation from that employment.

## XVI

This Agreement may be executed in one or more counterparts, each of which shall be

deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN WITNESS WHEREOF, Bridgette Fashion sets her hand and seal this 24 day of

October , 2013.

_____
Bridgette Fashion

Sworn to and subscribed to before
me this 24th day of October 2013.

_____
Notary Public          My Commission Expires
                       April 27, 2017

_____
For and on behalf of Access Insurance Holdings, Inc.

Page 11 of 11

## Exhibit A

## WAIVER OF TWENTY-ONE (21) DAY CONSIDERATION PERIOD

I, Bridgette Fashion, understand and agree to the following:

1.  In connection with a Lawsuit I have filed in the U.S. District Court for the Northern District of Georgia against Access Insurance Holdings, Inc., I have been presented with a Settlement Agreement and General Release ("Agreement") that I have to sign in order to receive any settlement proceeds.

2.  The Agreement provides that I have been given the opportunity to take twenty-one (21) days to consider the Agreement before signing it.

3.  I have reviewed the Agreement, and I understand it and am in agreement with its terms.

4.  I would prefer to sign and return this Agreement and receive my settlement proceeds without having to wait the entire twenty-one (21) day consideration period.

5.  In order to sign and return this Agreement and receive my settlement payment(s) without having to wait the entire twenty-one (21) day consideration period, I hereby waive my right to take twenty-one (21) days to consider the Agreement before signing it, and instead choose to sign it at the same time as this Waiver or soon thereafter.

BY SIGNING MY NAME BELOW, I HEREBY CERTIFY THAT I UNDERSTAND AND AGREE TO THE TERMS OF THIS WAIVER, AND THAT MY DECISION TO SIGN THIS WAIVER WAS ENTIRELY VOLUNTARY.

Dated: Oct 24 , 2013          Bridgette J. Fashion
                              Bridgette Fashion

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Sagal Arraleh-Mitchum ("Mitchum") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

I

For and in consideration of the execution and non-revocation of this Agreement by Mitchum, Access agrees to provide Mitchum with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows:  (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the total amount of mediation fees and expenses incurred by Mitchum and the

Page 1 of 10

other Plaintiffs in the Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Mitchum in the gross amount of twelve thousand dollars and zero cents ($12,000.00), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Mitchum a Form W-2 at year-end for such payment; (c) a check made payable to Mitchum in the gross amount of twelve thousand dollars and zero cents ($12,000.00), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) less the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]   These benefits are provided in settlement of all Mitchum's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Mitchum against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al. v. Access Insurance Holdings, Inc.* (the "Lawsuit"); and the Charge of Discrimination filed by Mitchum currently pending

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

before the U.S. Equal Employment Opportunity Commission, which has been assigned EEOC

Charge Number 410-2011-05628 (the "Mitchum Charge").

Delivery of the settlement checks shall be made to Mitchum's attorney of record, Abigail

J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above,

following: (1) dismissal of Mitchum's claims in the Lawsuit, with prejudice; (2) withdrawal of

the Mitchum Charge; (3) receipt by defense counsel, Martenson, Hasbrouck & Simon LLP, of

the original, facsimile, or e-mail copy of this Agreement; (4) Court approval of this Agreement;

and (5) receipt of a W-9 form executed by Barrett & Farahany, LLP. The documents referenced

in numbers (3) and (5) of the preceding sentence shall be sent to: Lisa J. Bauer, Martenson,

Hasbrouck & Simon LLP, 3379 Peachtree Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the

receipt and sufficiency of which are hereby acknowledged, Mitchum does hereby knowingly

and voluntarily release and forever discharge, both jointly and severally, Access, its corporate

parent(s) and affiliates, their officers, directors, employees (current and former), and their

shareholders, attorneys, servants and agents, together with their successors in interest by

conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to

as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of

money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity

(hereinafter collectively referred to as "claims"), whether known or unknown, which she ever

had, now has, or may or might in the future have against the Releasees, arising out of events

or occurrences which arose at or before the moment Mitchum signs this Agreement,

including, but not limited to (i) those claims arising out of or in any way connected with the

Page 3 of 10

circumstances surrounding the Lawsuit and/or the Mitchum Charge; (ii) those claims arising out of the employment relationship which existed between Mitchum and Access and/or the termination of that relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f), *et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other applicable state fair employment practices statute, and/or any ordinance promulgated by any county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time, and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other applicable state and local wage and hour statutes; (x) those claims arising under the Worker Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.*, the Whistleblower Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.*

and/or any other state or federal retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those claims arising under any federal or state handicap or disability discrimination act, regulation or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious conduct of any kind; (xvii) those claims for interference with business relationships, contractual relationships, or employment relationships of any kind; (xviii) those claims for breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims for interference with and/or breach of contract (express or implied, in fact or in law, oral or written); (xx) those claims arising under or in reliance upon any statute, regulation or ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-20(b); (xxiii) those claims arising under O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-280; (xxvi) any and all other claims which Mitchum ever had, now has, or may or might in the future have arising by reason of or in any way connected with any employment relationship which may have existed prior to or on the date hereof between Mitchum and Access and/or the termination of that relationship.

III

Mitchum further acknowledges and covenants that, in consideration for the agreements and commitments set forth herein, she has knowingly relinquished, waived and

forever released any and all damages and remedies which might otherwise be available to her, including, without limitation, claims for contract or tort damages of any type, claims for legal or equitable relief under either federal or state statutory and common law, claims for backpay, reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any lawsuit or administrative action arising out of her employment with Access. Mitchum further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Mitchum, Mitchum shall not accept any benefits awarded in her favor, if any, including without limitation, any damages or injunctive relief specific to Mitchum. Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived. In this regard, Mitchum acknowledges and agrees that she has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to her for her entire tenure of employment with Access and that the consideration being provided her herein is above and beyond that which is available under any severance or other policy of Access.

IV

Mitchum further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by her herein. Mitchum also acknowledges and covenants that she understands that after signing this Agreement, she cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it. Mitchum further agrees that she will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice,

including but not limited to executing a Stipulation of Dismissal and returning it to Access's

counsel for filing with the Court, and to withdraw the Mitchum Charge.

V

Mitchum agrees that she shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that she shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to her described in Paragraph I above. The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Mitchum represents, understands, and agrees that she will not apply for or otherwise seek employment with Access and that she will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates. Mitchum further acknowledges and agrees that, if she is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Mitchum's employment, upon becoming aware of Mitchum's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Mitchum agrees and covenants that she will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or

friends.  Access likewise agrees that, if Mitchum's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond merely by verifying Mitchum's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Mitchum during any such communications.  Mitchum does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Mitchum agrees and covenants that she has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to her satisfaction.  Mitchum further represents and agrees that she was advised and encouraged, prior to her execution of this Agreement, to discuss and review all aspects of this Agreement with her private attorney and that she has, to the extent she wished to do so, availed herself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Mitchum voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Mitchum may have.  Mitchum also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

Page 8 of 10

XI

This Agreement shall be binding upon Mitchum, her heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Mitchum based or founded upon any of the claims released herein. All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns. Mitchum represents and warrants that, as of the date of execution of this Agreement, she has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein. Mitchum further agrees that she shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be asserted against the amount paid in settlement of this action or against any recovery by Mitchum in this Lawsuit.

XII

Mitchum acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

XIII

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

XIV

This Agreement constitutes the entire agreement between Mitchum and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or

contemporaneous agreements, representations or understandings, written or oral. It is expressly understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Mitchum and an authorized representative of Access. This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Mitchum with Access and/or Mitchum's separation from that employment.

XV

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN WITNESS WHEREOF, Sagal Arraleh-Mitchum sets her hand and seal this _29_ day of _October_, 2013.

_____
Sagal Arraleh-Mitchum

Sworn to and subscribed to before
me this _29_ day of _October_ 2013.

_____        Corey Underhill
Notary Public                                                        Notary Public, Fulton County, Georgia
                                                                              My Commission Expires Jan. 12, 2014

_____
For and on behalf of Access Insurance Holdings, Inc.

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Ron Felder ("Felder") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

I

For and in consideration of the execution and non-revocation of this Agreement by Felder, Access agrees to provide Felder with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows: (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the total amount of mediation fees and expenses incurred by Felder and the other Plaintiffs in the

Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Felder in the gross amount of ten thousand eighty-seven dollars and sixty-one cents ($10,087.61), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Felder a Form W-2 at year-end for such payment; (c) a check made payable to Felder in the gross amount of ten thousand eighty-seven dollars and sixty-one cents ($10,087.61), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) less the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]  These benefits are provided in settlement of all Felder's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Felder against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al.  v. Access Insurance Holdings, Inc.* (the "Lawsuit").

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

Delivery of the settlement checks shall be made to Felder's attorney of record, Abigail J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above, following: (1) dismissal of Felder's claims in the Lawsuit, with prejudice; (2) receipt by defense counsel, Martenson, Hasbrouck & Simon LLP, of the original, facsimile, or e-mail copy of this Agreement; (3) Court approval of this Agreement; and (4) receipt of a W-9 form executed by Barrett & Farahany, LLP.  The documents referenced in numbers (2) and (4) of the preceding sentence shall be sent to: Lisa J. Bauer, Martenson, Hasbrouck & Simon LLP, 3379 Peachtree Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the receipt and sufficiency of which are hereby acknowledged, Felder does hereby knowingly and voluntarily release and forever discharge, both jointly and severally, Access, its corporate parent(s) and affiliates, their officers, directors, employees (current and former), and their shareholders, attorneys, servants and agents, together with their successors in interest by conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity (hereinafter collectively referred to as "claims"), whether known or unknown, which he ever had, now has, or may or might in the future have against the Releasees, arising out of events or occurrences which arose at or before the moment Felder signs this Agreement, including, but not limited to (i) those claims arising out of or in any way connected with the circumstances surrounding the Lawsuit; (ii) those claims arising out of the employment relationship which existed between Felder and Access and/or the termination of that

Page 3 of 11

relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f), *et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other applicable state fair employment practices statute, and/or any ordinance promulgated by any county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time, and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other applicable state and local wage and hour statutes; (x) those claims arising under the Worker Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.*, the Whistleblower Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.* and/or any other state or federal retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those claims arising under any federal or state handicap or disability discrimination act, regulation

or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious conduct of any kind; (xvii) those claims for interference with business relationships, contractual relationships, or employment relationships of any kind; (xviii) those claims for breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims for interference with and/or breach of contract (express or implied, in fact or in law, oral or written); (xx) those claims arising under or in reliance upon any statute, regulation or ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-20(b); (xxiii) those claims arising under  O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-280; (xxvi) any and all other claims which Felder ever had, now has, or may or might in the future have arising by reason of or in any way connected with any employment relationship which may have existed prior to or on the date hereof between Felder and Access and/or the termination of that relationship.

III

Felder further acknowledges and covenants that, in consideration for the agreements and commitments set forth herein, he has knowingly relinquished, waived and forever released any and all damages and remedies which might otherwise be available to him, including, without limitation, claims for contract or tort damages of any type, claims for legal

or equitable relief under either federal or state statutory and common law, claims for backpay, reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any lawsuit or administrative action arising out of his employment with Access. Felder further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Felder, Felder shall not accept any benefits awarded in his favor, if any, including without limitation, any damages or injunctive relief specific to Felder. Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived. In this regard, Felder acknowledges and agrees that he has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to him for his entire tenure of employment with Access and that the consideration being provided him herein is above and beyond that which is available under any severance or other policy of Access.

IV

Felder further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by him herein. Felder also acknowledges and covenants that he understands that after signing this Agreement, he cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it. Felder further agrees that he will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice, including but not limited to executing a Stipulation of Dismissal and returning it to Access's counsel for filing with the Court.

Page 6 of 11

V

Felder agrees that he shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that he shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to him described in Paragraph I above.  The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Felder represents, understands, and agrees that he will not apply for or otherwise seek employment with Access and that he will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates.  Felder further acknowledges and agrees that, if he is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Felder's employment, upon becoming aware of Felder's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Felder agrees and covenants that he will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or friends.  Access likewise agrees that, if Felder's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond

Page 7 of 11

merely by verifying Felder's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Felder during any such communications. Felder does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Felder agrees and covenants that he has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to his satisfaction. Felder further represents and agrees that he was advised and encouraged, prior to his execution of this Agreement, to discuss and review all aspects of this Agreement with his private attorney and that he has, to the extent he wished to do so, availed himself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Felder voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Felder may have. Felder also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

XI

Felder acknowledges that he was given at least twenty-one (21) days to consider this Agreement prior to signing, and that he has seven (7) days after execution to revoke his agreement to its terms.  In the event Felder decides to waive the twenty-one (21) day time period in which to consider this Agreement and decide to sign this Agreement immediately, he agrees to execute the Waiver attached hereto as Exhibit A.

XII

This Agreement shall be binding upon Felder, his heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Felder based or founded upon any of the claims released herein.  All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns.  Felder represents and warrants that, as of the date of execution of this Agreement, he has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein.  Felder further agrees that he shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be asserted against the amount paid in settlement of this action or against any recovery by Felder in this Lawsuit.

XIII

Felder acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

XIV

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

XV

This Agreement constitutes the entire agreement between Felder and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or contemporaneous agreements, representations or understandings, written or oral. It is expressly understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Felder and an authorized representative of Access. This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Felder with Access and/or Felder's separation from that employment.

XVI

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN WITNESS WHEREOF, Ron Felder sets his hand and seal this 14 day of November,

2013.

Ron Felder

Sworn to and subscribed to before
me this 14 day of November 2013.

Notary Public

OFFICIAL SEAL
DIANA HOWE
Notary Public, Georgia
COBB COUNTY
My Commission Expires
December 8, 2015

For and on behalf of Access Insurance Holdings, Inc.

## Exhibit A

## WAIVER OF TWENTY-ONE (21) DAY CONSIDERATION PERIOD

I, Ron Felder, understand and agree to the following:

1.  In connection with a Lawsuit I have filed in the U.S. District Court for the Northern District of Georgia against Access Insurance Holdings, Inc., I have been presented with a Settlement Agreement and General Release ("Agreement") that I have to sign in order to receive any settlement proceeds.

2.  The Agreement provides that I have been given the opportunity to take twenty-one (21) days to consider the Agreement before signing it.

3.  I have reviewed the Agreement, and I understand it and am in agreement with its terms.

4.  I would prefer to sign and return this Agreement and receive my settlement proceeds without having to wait the entire twenty-one (21) day consideration period.

5.  In order to sign and return this Agreement and receive my settlement payment(s) without having to wait the entire twenty-one (21) day consideration period, I hereby waive my right to take twenty-one (21) days to consider the Agreement before signing it, and instead choose to sign it at the same time as this Waiver or soon thereafter.

BY SIGNING MY NAME BELOW, I HEREBY CERTIFY THAT I UNDERSTAND AND AGREE TO THE TERMS OF THIS WAIVER, AND THAT MY DECISION TO SIGN THIS WAIVER WAS ENTIRELY VOLUNTARY.

Dated: 11/14, 2013

Ron Felder

## GENERAL RELEASE AND SETTLEMENT AGREEMENT

This General Release and Settlement Agreement ("Agreement") is made and entered into by and between Toshira Pryce ("Pryce") and Access Insurance Holdings, Inc. on behalf of its affiliates, subsidiaries, and parents, including but not limited to Access Claims Administrators, Inc., Access General Insurance Agency of California, Inc., Access General Agency, Inc., Access General Agency of Georgia, Inc., Access Insurance Consultants, Inc., Access Premium Finance, Inc., Access General Insurance Company, Access General Agency of Florida, Inc., Access General Agency of Pennsylvania, Inc., Access Insurance Company, Access General Insurance Adjusters, Inc., Access General Agency of Alabama, Inc., Access General Agency of Arizona, Inc., Access General Insurance Agency of Texas, Inc., Access General Agency of Louisiana, Inc., Access General Insurance Agency of Oklahoma, Inc., Access General Agency of South Carolina, Inc., Access General Agency of Indiana, Inc., Access Administrative Services, Inc., Access General Agency of Mississippi, Inc., Access General Agency of Arkansas, Inc., Access General Agency of Nevada, Inc., Access Adjusting Services, Inc., Access General Agency of Tennessee, Inc., Access Corporate Services, Inc., Access General Agency of New Mexico, Inc., Access Holdco, LLC, Turning Leaf Group, Inc., and Access Auto Club, Inc. (collectively, "Access").

I

For and in consideration of the execution and non-revocation of this Agreement by Pryce, Access agrees to provide Pryce with certain valuable consideration, the sufficiency and receipt of which is hereby acknowledged, payable as follows:  (a) a check made payable to Hunter R. Hughes, III, Esq. and/or the law firm of Rogers & Hardin LLP in payment of the total amount of mediation fees and expenses incurred by Pryce and the other Plaintiffs in the

Lawsuit defined below (collectively hereinafter referred to as "Plaintiffs") related to the August 14, 2013 mediation and subsequent settlement discussions between Plaintiffs and Access, payable upon receipt of an invoice from Hunter R. Hughes, III, Esq.; (b) a check made payable to Pryce in the gross amount of twelve thousand five hundred dollars and zero cents ($12,500.00), minus any applicable federal, state and/or local tax withholdings, payable on or before January 6, 2014, issuing Pryce a Form W-2 at year-end for such payment; (c) a check made payable to Pryce in the gross amount of twelve thousand five hundred dollars and zero cents ($12,500.00), issuing a Form 1099 at year-end for such payment; and (d) a check made payable to Barrett & Farahany, LLP in the gross amount of one hundred thirty-six thousand five hundred and twenty-nine dollars and ninety-seven cents ($136,529.97) less the amount referenced in subsection (a) of Paragraph I above attributable to Plaintiffs' share of the mediation fees and expenses, payable on or before January 6, 2014, issuing a Form 1099 at year-end for such payment.[1]  These benefits are provided in settlement of all Pryce's claims against Access Insurance Holdings, Inc. and/or all of its affiliated companies and representatives listed on page 1 hereof, including any Complaint(s) and/or Charge(s) of Discrimination filed by Pryce against Access, including the Complaint currently pending in the U.S. District Court for the Northern District of Georgia, Civil Action No. 1:11-CV-01836-CAP, captioned *Benjamin Napper, et al. v. Access Insurance Holdings, Inc.* (the "Lawsuit").

Delivery of the settlement checks shall be made to Pryce's attorney of record, Abigail J. Larimer, Esq. of Barrett & Farahany, LLP, on the payment schedule described above, following:

---

[1] While the amounts listed in subsections (a) and (c) of Paragraph I of this Agreement are referenced in separate Agreements with other Plaintiffs, the parties acknowledge and agree that Access will only provide Barrett & Farahany, LLP with a single payment of $136,529.97 (less the monies referenced in subsection (a) of Paragraph I).

(1) dismissal of Pryce's claims in the Lawsuit, with prejudice; (2) receipt by defense counsel, Martenson, Hasbrouck & Simon LLP, of the original, facsimile, or e-mail copy of this Agreement; (3) Court approval of this Agreement; and (4) receipt of a W-9 form executed by Barrett & Farahany, LLP. The documents referenced in numbers (2) and (4) of the preceding sentence shall be sent to: Lisa J. Bauer, Martenson, Hasbrouck & Simon LLP, 3379 Peachtree Road, Suite 400, Atlanta, Georgia 30326.

II

For and in consideration of the agreements and commitments set forth above, the receipt and sufficiency of which are hereby acknowledged, Pryce does hereby knowingly and voluntarily release and forever discharge, both jointly and severally, Access, its corporate parent(s) and affiliates, their officers, directors, employees (current and former), and their shareholders, attorneys, servants and agents, together with their successors in interest by conversion, merger or otherwise and assigns and insurers (hereinafter collectively referred to as the "Releasees") from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, damages, judgments, claims and demands whatsoever, in law or in equity (hereinafter collectively referred to as "claims"), whether known or unknown, which she ever had, now has, or may or might in the future have against the Releasees, arising out of events or occurrences which arose at or before the moment Pryce signs this Agreement, including, but not limited to (i) those claims arising out of or in any way connected with the circumstances surrounding the Lawsuit; (ii) those claims arising out of the employment relationship which existed between Pryce and Access and/or the termination of that relationship; (iii) those claims arising under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f),

*et seq.*, Georgia's Age Discrimination Act, O.C.G.A. § 34-1-2, Georgia's Equal Employment for Persons with Disabilities Code, O.C.G.A. §§ 34-6A-1 through 34-6A-6, and/or the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*; (iv) those claims arising under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*; (v) those claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and/or any other applicable state fair employment practices statute, and/or any ordinance promulgated by any county, municipality, or other state subdivision; (vi) those claims arising under the Equal Pay Act of 1963, 29 U.S.C. §§ 206, *et seq.*, O.C.G.A. § 34-4-1 *et seq.*, Georgia's Equal Pay for Equal Work Act, O.C.G.A. § 34-5-1 *et seq.*, and/or any state or local equal pay law or ordinance; (vii) those claims arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.*, including, but not limited to, salary, severance pay and accrued time, and any other benefits; (viii) those claims arising under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, O.C.G.A. § 34-6-6, and any state and/or local labor management relations laws; (ix) those claims arising under the Fair Labor Standards Act, and any other applicable state and local wage and hour statutes; (x) those claims arising under the Worker Adjustment and Retraining Notification Act; (xi) those claims arising under the Family and Medical Leave Act and/or any state and/or local family leave laws; (xii) those claims arising under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A *et seq.,* the Whistleblower Protection Act of 1989, 5 U.S.C. § 1201 (2000) *et seq.* and/or any other state or federal retaliation and/or whistleblower protection statute, act, regulation or provision; (xiii) those claims arising under any federal or state handicap or disability discrimination act, regulation or executive order; (xiv) those claims for retaliatory or wrongful discharge of any kind, including, but not limited to, workers' compensation retaliation; (xv) those claims for

intentional or negligent infliction of emotional distress or outrageous conduct; (xvi) those claims for breach of duty, misrepresentation, fraud, negligence (including but not limited to negligent hiring, training, retention, and/or supervision), libel, slander, defamation or tortious conduct of any kind; (xvii) those claims for interference with business relationships, contractual relationships, or employment relationships of any kind; (xviii) those claims for breach of duty and/or the implied covenant of good faith and fair dealing; (xix) those claims for interference with and/or breach of contract (express or implied, in fact or in law, oral or written); (xx) those claims arising under or in reliance upon any statute, regulation or ordinance (local, state, or federal); (xxi) those claims arising under public policy; (xxi) those claims arising under O.C.G.A. § 18-4-7; (xxii) those claims arising under O.C.G.A. § 19-11-20(b); (xxiii) those claims arising under  O.C.G.A. § 23-3-120 *et seq.*; (xxiv) those claims arising under O.C.G.A. § 34-1-3 *et seq.*; (xxv) those claims arising under O.C.G.A. § 38-2-280; (xxvi) any and all other claims which Pryce ever had, now has, or may or might in the future have arising by reason of or in any way connected with any employment relationship which may have existed prior to or on the date hereof between Pryce and Access and/or the termination of that relationship.

III

Pryce further acknowledges and covenants that, in consideration for the agreements and commitments set forth herein, she has knowingly relinquished, waived and forever released any and all damages and remedies which might otherwise be available to her, including, without limitation, claims for contract or tort damages of any type, claims for legal or equitable relief under either federal or state statutory and common law, claims for backpay, reinstatement and recovery of attorneys' fees, and the right to be a member in any class in any

Page 5 of 11

lawsuit or administrative action arising out of her employment with Access. Pryce further agrees that if a state or federal agency (including, but not limited to, the Department of Labor or the Equal Employment Opportunity Commission) independently pursues any relief on behalf of Pryce, Pryce shall not accept any benefits awarded in her favor, if any, including without limitation, any damages or injunctive relief specific to Pryce. Notwithstanding any other provision contained herein, nothing in this Agreement shall be construed as a waiver of any right which, by law, cannot be waived. In this regard, Pryce acknowledges and agrees that she has been paid for any and all compensation (including straight time, overtime, vacation and bonus monies) purportedly owed to her for her entire tenure of employment with Access and that the consideration being provided her herein is above and beyond that which is available under any severance or other policy of Access.

IV

Pryce further acknowledges and covenants not to sue the Releasees, or to participate or aid in any way in any suit or proceeding or to execute, seek to impose, collect or recover upon, or otherwise enforce or accept any judgment, decision, award, warrant or attachment upon any claim released by her herein. Pryce also acknowledges and covenants that she understands that after signing this Agreement, she cannot proceed against any person or party mentioned in it with respect to or on account of any of the matters referred to in it. Pryce further agrees that she will take whatever steps are necessary to ensure that the Lawsuit is dismissed with prejudice, including but not limited to executing a Stipulation of Dismissal and returning it to Access's counsel for filing with the Court.

V

Pryce agrees that she shall be responsible for the payment of any and all local, state, and/or federal taxes which may be attributable to the payments described above and that she shall indemnify and hold Releasees harmless from any and all tax consequences, including interest and/or penalties, arising out of the payments to her described in Paragraph I above. The parties acknowledge that no representations have been or are made herein by or to any signatory to this Agreement regarding the tax consequences of this Agreement.

VI

In further consideration of this Agreement and the commitments set forth in Paragraph I hereinabove, Pryce represents, understands, and agrees that she will not apply for or otherwise seek employment with Access and that she will not be reemployed by Access and/or its parent, subsidiaries, divisions or affiliates. Pryce further acknowledges and agrees that, if she is inadvertently hired by Access and/or its parent, subsidiaries, divisions or affiliates, such entity shall be entitled to immediately terminate Pryce's employment, upon becoming aware of Pryce's hiring, based solely on the provisions in this Paragraph, regardless whether or not any other grounds for termination may exist.

VII

Pryce agrees and covenants that she will not directly or indirectly, orally or in writing, disparage Access and/or any of its services, employees (current and former), officers, directors, members, representatives, agents, customers, and/or attorneys in any way or interfere in any way with its relationships with its customers, employees, family and/or friends. Access likewise agrees that, if Pryce's prospective employers make inquiries to Access's Human Resources Department, the Human Resources Department: (1) will respond

merely by verifying Pryce's dates of employment; and (2) will not, directly or indirectly, verbally or in writing, disparage Pryce during any such communications. Pryce does further agree not to solicit or encourage any individual to bring a claim against Releasees.

VIII

Pryce agrees and covenants that she has carefully reviewed, studied and thought over the terms of this Agreement, and that all questions concerning this Agreement have been answered to her satisfaction. Pryce further represents and agrees that she was advised and encouraged, prior to her execution of this Agreement, to discuss and review all aspects of this Agreement with her private attorney and that she has, to the extent she wished to do so, availed herself of this opportunity.

IX

It is also understood and agreed that this Agreement is executed by Pryce voluntarily and is not based upon any representations or statements of any kind made by Access or its representatives as to the merits, legal liabilities, or value of any current or potential claims which Pryce may have. Pryce also acknowledges that no promise or inducement for this Agreement has been offered or made, except as herein set forth.

X

It is further understood and agreed that this Agreement is entered into voluntarily by the parties, that this settlement is a compromise of disputed claims and that the payment conferred herein is not to be construed as an admission of liability on the part of the persons, corporations and entities hereby released, by whom liability is expressly denied.

XI

This Agreement shall be binding upon Pryce, her heirs, executors, administrators, assigns, successors, beneficiaries, employees and agents, and all other persons asserting claims by, on behalf of, or through Pryce based or founded upon any of the claims released herein. All terms of this Agreement shall inure to the benefit of the Releasees and their predecessors, successors and assigns. Pryce represents and warrants that, as of the date of execution of this Agreement, she has not conveyed, transferred, pledged, hypothecated, or in any manner whatsoever, assigned or encumbered any of the rights, demands, suits, judgments, actions, or causes of action released herein. Pryce further agrees that she shall protect, defend and indemnify Releasees against any and all liens, subrogation claims and other rights that may be asserted against the amount paid in settlement of this action or against any recovery by Pryce in this Lawsuit.

XII

Pryce acknowledges that this Agreement is made and entered into in the State of Georgia and shall, in all respects, be interpreted, enforced and governed under the laws of said State.

XIII

Should any word, phrase, clause, sentence or paragraph of this Agreement be deemed unenforceable by a competent court of law, the enforceability of the remainder of the Agreement shall be unaffected.

XIV

This Agreement constitutes the entire agreement between Pryce and the Releasees pertaining to the subjects contained herein and supersedes any and all prior and/or contemporaneous agreements, representations or understandings, written or oral. It is expressly

Page 9 of 11

understood and agreed that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever except in writing duly executed by Pryce and an authorized representative of Access. This Agreement is intended fully, completely and forever to resolve all disputes based upon events, omissions or acts occurring on or prior to its execution, as well as all other issues or claims in any way arising out of, or connected with, the prior employment of Pryce with Access and/or Pryce's separation from that employment.

XV

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Furthermore, signatures delivered via facsimile or email transmission shall have the same force and effect as the originals thereof.

IN WITNESS WHEREOF, Toshira Pryce sets her hand and seal this 25 day of October , 2013.

_____
Toshira Pryce

Sworn to and subscribed to before me this 25 day of October 2013

```
LINDA PETMECKY
NOTARY PUBLIC
Dekalb County
State of Georgia
My Comm. Expires December 6, 2016
```

_____
Notary Public

Page 10 of 11

_____

For and on behalf of Access Insurance Holdings, Inc.